**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| MISSOURI JOINT MUNICIPAL ELECTRIC UTILITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 6:19-cv-03338-MDH |
| GRIDLIANCE HIGH PLAINS, LLC, | ) ) | |
| Defendant. | ) | |

## ORDER

Before the Court are cross motions for summary judgment. Plaintiff's Motion for Partial Summary Judgment (Doc. 72) and Defendant GridLiance's Motion for Summary Judgment. (Doc. 73). The motions are fully briefed and ripe for review.

## BACKGROUND

Plaintiff Missouri Joint Municipal Electric Utility Commission "MJMEUC" has filed a First Amended Complaint for declaratory judgment and specific performance to enforce the provisions of a Co-Development Agreement (the CDA) and an Asset Purchase Agreement (the APA). In essence, Plaintiff seeks to terminate the CDA and purchase certain transmission facilities from Defendant.

Plaintiff is a joint municipal utilities commission created and authorized by Missouri statutes. Defendant GridLiance is a regulated electric transmission utility dedicated to owning and operating electric power transmission facilities within the control of the Southwest Power Pool, Inc. ("SPP"), a regional transmission organization. The following facts, which are largely undisputed, are taken from the parties' briefs:

1

On June 30, 2014, Plaintiff entered into a CDA Agreement with Gridliance through Gridliance's predecessor in interest, South Central Municipal-Cooperative Network ("South Central MCN"). According to the CDA, the parties to the CDA desired "to promote the construction of transmission infrastructure that will be under the functional control of the Southwest Power Pool;" "that TransCo [GridLiance] develop, build, operate, and maintain such transmission assets;" "to set forth the basis for MJMEUC to participate in TransCo's [GridLiances's] development activities;" and "to develop the framework by which TransCo [GridLiance] will work with MJMEUC and seek to work with other non-profit utilities to meet their transmission needs . . . by providing MJMEUC and other UPs with one or more options for hedging a portion of their transmission costs through participation in zonal, regional and inter-regional transmission projects."

In addition, the CDA stated "in furtherance of this Agreement, TransCo [GridLiance] and MJMEUC or a Member may enter into one or more asset purchase agreement(s) (collectively, Asset Purchase Agreements or APAs) regarding the sale of assets to TransCo [GridLiance] in order for TransCo [GridLiance] to file and obtain regulatory approval to recover its transmission revenue requirements under the SPP OATT…."[1]

Section 7.3.1 of the CDA states in part:

**7.3.1 For Failure to Meet Start-Up Requirements**. Either Party may terminate this Agreement by giving the other Party written notice of the intent to terminate effective thirty (30) days from the delivery of such notice, after the periods set forth below; provided, however, that if the requirement is met during such thirty (30) day period, then the termination shall not be effective.

….

(c) If the Parties and any other UPs with fully effective CDAs have not agreed to the form of JOA and TCL or the Parties have not agreed to the form of APA on or

---

[1] The parties agree Missouri law governs the CDA.

2

before the first to occur of execution and delivery by a UP of the first APA with TransCo and December 31, 2014.

(d) If TransCo [Gridliance] has neither been awarded an NTC[2] for a Proposed Project nor commenced Construction of a Direct Assignment Facility on or before December 31, 2017.

Section 7.3.2 of the CDA provides:

**7.3.2 At MJMEUC's Option**. MJMEUC may terminate this Agreement during the Initial Term or any Renewal Term with two-years' written notice, such termination to be effective on any day after the tenth anniversary of the Effective Date.

Section 7.1.2 of the CDA states:

**7.1.2 Initial Term and Renewal Terms**. The initial term of this Agreement shall be thirty (30) years from the Effective Date (the Initial Term). Subject to Section 7.3.2, the Initial Term shall automatically be extended for successive renewal terms of five (5) years each (each a Renewal Term), unless and until at least five (5) years prior to the commencement of the next Renewal Term, either Party has provided written notice of non-renewal to the other Party.

Section 7.1.1 of the CDA states:

**7.1.1 Effective Date**. Except for the rights and obligations set forth in ARTICLE 2 (Representations and Warranties), ARTICLE 5 (Support of Regulatory, Construction and Other Transactions), ARTICLE 7 (Term and Conditions Precedent), and ARTICLE 8 (Confidentiality), which obligations shall be effective upon the Execution Date, the rights and obligations of this Agreement shall not be effective until (a) the receipt of all Consents, (b) TransCo's Financial Closing as more fully described in Section 7.1.2, (c) delivery of the Officer's Certificates and Opinions, and (d) completion and certification by MJMEUC of Exhibit A1 to this Agreement, (the date on which the last of such conditions having been met being the Effective Date). The Parties will set a mutually acceptable date on which to complete the last of such conditions, at which time they shall acknowledge jointly in writing the Effective Date.

Section 4.2.2(a) of the CDA states:

(a) As soon as practicable after TransCo gives written notice to MJMEUC (Proposed Project Notice) of its intent to propose a transmission solution for consideration by SPP or to bid on a project already identified by SPP (either a Proposed Project), MJMEUC shall commence discussions with its Members or their representatives about their desire to participate in MJMEUC's financing of a

---

[2] An "NTC" is defined in the CDA as a "Notification to Construct" which is "SPP authorization to a Transmission Owner to begin Construction of a Project…."

Participation Percentage of the Proposed Project. MJMEUC will exercise the Project Option by providing TransCo a written notice (Option Notice) at any time after the Proposed Project Notice, but in no event later than fifteen (15) days prior to the date on which TransCo's submission of a transmission solution or bid on a Proposed Project is due to SPP. The Option Notice shall specify (i) MJMEUC's Maximum Participation Percentage calculated in accordance with Sections 4.2.2(c), 4.3, and 4.4 and (ii) MJMEUC's preliminary desired Participation Percentage up to its Maximum Participation Percentage. If no Option Notice is given in accordance with this Section 4.2.2(a), then MJMEUC's Participation Percentage shall be zero. Within ten (10) days following the submission of MJMEUC's Option Notice (or, if any other UP submits its qualifying option notice later (also an Option Notice)), within ten (10) days of the last qualifying Option Notice, but no later than five (5) days prior to the date TransCo's submission is due to SPP, TransCo shall provide written notice to MJMEUC identifying all UPs submitting an Option Notice for the Proposed Project and the Maximum Participation Percentage and preliminary desired Participation Percentage for each.

Section 4.2.2(b) of the CDA states:

(b) Not later than ten (10) days after its receipt of a NTC for a Proposed Project, whether directly from SPP or pursuant to an assignment from another DTO, TransCo shall provide notice to MJMEUC and all other UPs having submitted Option Notices (each a Project Notice) setting forth the details of the TransCo Project as approved by SPP, including the location, project schedule and project need date, if any, and any revision to MJMEUC's and other UPs' Maximum Participation Percentages based on the final configuration of the project as approved by SPP. In the event that the NTC requires the submission of a refined cost estimate for the TransCo Project, TransCo shall provide that revised cost estimate to MJMEUC and the other applicable UPs within two (2) days following submission to SPP. As soon as practical following the issuance of the Project Notice or, if required, the submission by TransCo of a revised cost estimate to SPP, TransCo, MJMEUC and any other UP that shall have submitted an Option Notice shall commence negotiations and enter into either a JOA or TCL for such TransCo Project specifying for MJMEUC and any other UP that shall have submitted an Option Notice the final Maximum Participation Percentage of each entity in the TransCo Project. The JOA or TCL for such TransCo Project shall require each applicable UP to finalize its Participation Percentage and close on its Participation Percentage no later than ninety (90) days prior to the scheduled in-service date of the TransCo Project. Closing shall be subject to standard conditions precedent, including MJMEUC's ability to obtain financing on reasonable terms and the ability of MJMEUC to obtain all necessary contracts from its Members sufficient to support its financing plan. For the avoidance of doubt, the unwillingness, for any reason, of a sufficient number of the Members to participate in the TransCo Project in order to fully subscribe for MJMEUC's Participation Percentage shall not constitute an event of default by MJMEUC under the JOA or TCL for such TransCo Project or under this Agreement.

Section 4.3.1 of the CDA states:

> 4.3.1 Direct Assignment Projects. The affected UP or UPs shall have the option to Participate in any TransCo Project or TransCo Project Segment comprising Direct Assignment Facilities as follows:
>
> (a) If involving only one affected UP, the affected UP's option shall be for a Participation Percentage of up to fifty percent (50%) of such Direct Assignment Facilities.
>
> (b) If involving two or more affected UPs (e.g., because a TransCo Project Segment is located in a zone covered by two or more UPs' Footrpints [sic]), each affected UP shall have an option to Participate in up to fifty percent (50%) of such Direct Assignment Facilities, such option allocated by each UP's pro rata share of total UP LRS in the zone.

GridLiance, through its predecessor in interest South Central MCN, entered into an Asset Purchase Agreement with the City of Nixa, Missouri, dated August 14, 2015 (the "APA"). Nixa is a member of MJMEUC. The APA provides for the sale by the City of Nixa, Missouri to GridLiance real property and personal property which is more fully described in the APA as the "Nixa Assets." The Nixa Assets generally consists of approximately 10 miles of transmission line and the accompanying facilities such as breakers and substation properties. The City of Nixa transferred the Nixa Assets to GridLiance pursuant to the APA.

In a letter dated September 19, 2019, Plaintiff informed Defendant that "[p]er Sections 7.3.1(a), (b) and (c) of the SPP Co-Development Agreement (SPP CDA), MJMEUC hereby terminates the SPP CDA, effective thirty (30) days from the date of this letter." In the same letter dated September 19, 2019, Plaintiff further informed Defendant that "[p]er Section 7.3.4(c) of the SPP CDA and Section 8.3 of the Asset Purchase Agreement between South Central MCN LLC and the City of Nixa, Missouri, MJMEUC hereby provides notices of its intent to purchase the assets sold by the City of Nixa to Gridliance High Plains, LLC, the successor in interest to South Central MCN, LLC." During the September 19, 2019 meeting, when Plaintiff hand-delivered its

notice of termination to Defendant's representatives, Defendant disputed Plaintiff's right to terminate.

In a letter dated October 10, 2019, Plaintiff informed Defendant that it was "amend[ing] and restat[ing]" the September 19, 2019 correspondence and that "MJMEUC has the right to terminate, and hereby terminates, the SPP CDA for failure to achieve any of the start-up requirements set forth therein on a timely basis," that GridLiance "still [has] not achieved the start-up requirements set forth in Sections 7.3.1(b), (c) and (d)," and that "[t]his termination is effective thirty (30) days from the date of this letter." The letter further stated: "[a]s stated in my September 19, 2019 letter, per Section 7.3.4(c) of the SPP CDA and Section 8.3 of the Asset Purchase Agreement between South Central MCN LLC and the City of Nixa, Missouri, MJMEUC hereby provides notice of its intent to purchase the assets sold by the City of Nixa to Gridliance High Plains, LLC, the successor in interest to South Central MCN, LLC." The letter continues: "[w]ithout waiving any of its rights to terminate pursuant to Section 7.3.1, MJMEUC has the additional right to terminate, and hereby notifies you of the termination of, the SPP CDA in accordance with Section 7.3.2" and "[i]f not terminated earlier in accordance with Section 7.3.1, this termination is effective as of June 14, 2026."   Finally, the letter informed GridLiance that "[a]s stated in my September 19 and October 10, 2019 letters, per Section 7.3.4(c) of the SPP CDA and Section 8.3 of the Asset Purchase Agreement between South Central MCN LLC and the City of Nixa, Missouri, MJMEUC hereby provides notice of its intent to purchase the assets sold by the City of Nixa to Gridliance High Plains, LLC, the successor in interest to South Central MCN, LLC."

On October 17, 2019, Defendant wrote to Plaintiff stating in part: "[t]his letter provides MJMEUC the option to Participate in a Direct Assignment Facility" and that "[t]his letter is

6

provided, and the availability of any right you may exercise pursuant to our notice exists, only if your purported termination is not effective." In the same letter, Defendant also stated: "the notice and exercise periods in the CDA for Option Notices do not fit neatly into this fact pattern. We need your decision on whether to exercise the Participation Option as soon as possible, ideally by November 1, 2019." The Direct Assignment Facility to which GridLiance's October 17, 2019 letter referred was work to "[r]econductor 1.25 miles of 69 kV line from Nixa Downtown – Nixa Espy" on the Nixa Assets, which was the subject of an NTC that was awarded by SPP and recorded August 17, 2018 (the "Nixa Upgrades"). In accepting the NTC for the Nixa Upgrades, Defendant notified SPP that it anticipated an in-service date of December 31, 2019. Defendant had not previously provided Plaintiff written notice of its intent to propose the Nixa Upgrades to SPP or to submit a bid to the SPP for the Nixa Upgrades. Further, prior to the October 17, 2019 letter, Defendant had not previously provided Plaintiff written notice of the Nixa Upgrades.

On October 29, 2019, Plaintiff sent a letter to Defendant stating: "[w]ithout waiving any of its rights to terminate pursuant to Section 7.3.1, MJMEUC has the additional right to terminate, and hereby notifies you of the termination of the SPP CDA in accordance with Section 7.3.2. If not terminated earlier in accordance with Section 7.3.1, this termination is effective as of June 30, 2024, or alternatively, no later than, June 14, 2026." The letter further stated: "[a]s stated in my September 19 and October 10, 2019 letters, per Section 7.3.4(c) of the SPP CDA and Section 8.3 of the Asset Purchase Agreement between South Central MCN LLC and the City of Nixa, Missouri, MJMEUC hereby provides notice of its intent to purchase the assets sold by the City of Nixa to Gridliance High Plains, LLC, the successor in interest to South Central MCN, LLC."

Section 7.3.4(c) of the CDA states:

(c) If MJMEUC terminates this Agreement prior to the end of the Initial Term or any Renewal term, then, as more fully described in the applicable APA, at

7

MJMEUC's option exercised by written notice to TransCo within sixty (60) days of such termination (Member Asset Option), TransCo shall be obligated to sell back to MJMEUC or the selling Member any Transmission Facilities purchased by TransCo from MJMEUC or such selling Member, such sale to be at TransCo's PP&E as of the last day of the month prior to the closing.

Section 8.3 of the APA states:

8.3 Seller Repurchase Option. If MJMEUC terminates the CDA prior to the end of the Initial Term (as defined in the CDA) or any Renewal Term (as defined in the CDA), then Seller or MJMECU [sic] may repurchase the Assets and any improvements thereto (the Repurchase Option). To exercise the Repurchase Option, Seller or MJMEUC shall provide written notice to Buyer within sixty (60) days of MJMEUC's termination of the CDA (the Repurchase Notice). If the Repurchase Option is exercised, Buyer shall sell the Assets and any improvements thereto to MJMEUC or Seller, as applicable, for an amount equal to Buyer's PP&E, but otherwise on the terms and conditions set forth in this Agreement, to the extent such terms are applicable. For purposes of this Agreement, Buyer's PP&E means the net property, plant and equipment value of the Assets and any improvements thereto reflected on Buyer's asset register based on Buyer's financial statements reduced by accumulated depreciation associated with such Assets and improvements thereto, in all cases in accordance with the system of accounts approved by FERC and applicable to electric public utilities under subchapter C, Part 101 of 18 C.F.R. The rights and obligations of this Section 8.3 shall survive termination of this Agreement and MJMEUC shall be an express third party beneficiary of this Section 8.3.

The parties' pending summary judgment motions move the Court to rule on several issues surrounding Plaintiff's notices of termination to Defendant.

## STANDARD

Summary judgment is proper where, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1359 (8th Cir. 1993). "Where there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Quinn v. St. Louis County*, 653 F.3d 745, 750 (8th Cir. 2011). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S.

8

317, 323 (1986). If the movant meets the initial step, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To satisfy this burden, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## DISCUSSION

The parties have filed cross motions for summary judgment. First, Defendant's motion argues: 1) Plaintiff cannot terminate the CDA under 7.3.1(c) because Plaintiff either waived or stipulated satisfaction of the requirements under that section; 2) Plaintiff cannot terminate the CDA under 7.3.1(d) because Defendant satisfied its obligations under that section; 3) Plaintiff's attempted termination is barred by the doctrine of laches; 4) Plaintiff waived its right to terminate the CDA under 7.3.1; and 5) Plaintiff's claims are not ripe.

In contrast, Plaintiff argues: 1) Plaintiff terminated the CDA pursuant to 7.3.1(d) effective November 10, 2019 by way of the October 10, 2019 written notice; 2) Plaintiff has a right to terminate the CDA pursuant to 7.3.2 and has issued a timely and valid notice to terminate by way of the October 11, 2019 letter (supplemented on October 29, 2019) and the CDA will terminate at the latest on June 30, 2024, or alternatively June 14, 2026; and 3) upon termination of the CDA, Plaintiff is entitled to repurchase the Nixa Assets and Defendant is obligated to sell them in accordance with the CDA and the APA.

Because the issues raised by the motions for summary judgment are overlapping the Court addresses the issues raised by both parties throughout its analysis.

1. **Plaintiff terminated the CDA pursuant to 7.3.1(d) effective November 10, 2019, by way of the October 10, 2019 written notice.**

Plaintiff argues that it notified Defendant of its intent to terminate on October 10, 2019, effective in 30 days – November 10, 2019, because Defendant failed to satisfy the CDA's start-up requirements including those in Section 7.3.1(d), which required Defendant to either obtain a NTC from SPP for a Proposed Project or to commence Construction of a Direct Assignment Facility on or before December 31, 2017.[3] Defendant contends it cured the failure to meet the deadline by its October 17, 2019 letter providing Plaintiff the option to participate in the Direct Assignment Facility under the CDA. In addition, Defendant argues it satisfied its requirements prior to the letter and that Plaintiff knew that Defendant had already been awarded an NTC and had begun construction of the Nixa Upgrades well before it sent the letter.

Section 7.3.1 of the CDA states in part:

7.3.1 For Failure to Meet Start-Up Requirements. Either Party may terminate this Agreement by giving the other Party written notice of the intent to terminate effective thirty (30) days from the delivery of such notice, after the periods set forth below; provided, however, that if the requirement is met during such thirty (30) day period, then the termination shall not be effective.
….

(d) If TransCo has neither been awarded an NTC for a Proposed Project nor commenced Construction of a Direct Assignment Facility on or before December 31, 2017.

**A. Proposed Project**

Plaintiff argues the Nixa Upgrades are not a Proposed Project under the CDA and Defendant's October 17, 2019 letter did not "cure" the provision. A Proposed Project and Proposed Project Notice are defined in the CDA under Section 4.2.2. Section 4.2.2 states, in part,

---

[3] Plaintiff contends its written notices also terminated the CDA for Defendant's failure to meet other start-up requirements under Section 7.3.1(c), but that the related material fact issues for resolving those portions of Plaintiff's claims are more suitable for trial than summary judgment.

a) As soon as practicable after TransCo gives written notice to MJMEUC (Proposed Project Notice) of its intent to propose a transmission solution for consideration by SPP or to bid on a project already identified by SPP (either a Proposed Project), MJMEUC shall commence discussions with its Members or their representatives about their desire to participate in MJMEUC's financing of a Participation Percentage of the Proposed Project. MJMEUC will exercise the Project Option by providing TransCo a written notice (Option Notice) at any time after the Proposed Project Notice, but in no event later than fifteen (15) days prior to the date on which TransCo's submission of a transmission solution or bid on a Proposed Project is due to SPP. The Option Notice shall specify (i) MJMEUC's Maximum Participation Percentage calculated in accordance with Sections 4.2.2(c), 4.3, and 4.4 and (ii) MJMEUC's preliminary desired Participation Percentage up to its Maximum Participation Percentage. If no Option Notice is given in accordance with this Section 4.2.2(a), then MJMEUC's Participation Percentage shall be zero. Within ten (10) days following the submission of MJMEUC's Option Notice (or, if any other UP submits its qualifying option notice later (also an Option Notice)), within ten (10) days of the last qualifying Option Notice, but no later than five (5) days prior to the date TransCo's submission is due to SPP, TransCo shall provide written notice to MJMEUC identifying all UPs submitting an Option Notice for the Proposed Project and the Maximum Participation Percentage and preliminary desired Participation Percentage for each.

First, Plaintiff argues the Nixa Upgrades was not a Proposed Project because Defendant never gave Plaintiff written notice of its intent to propose the Nixa Upgrades to SPP or to submit a bid to SPP for the Nixa Upgrades. Plaintiff contends as a result that the process under Section 4.2.2 was neither triggered nor followed. In essence, Plaintiff argues that Defendant failed to timely provide a Proposed Project Notice and as a result the Nixa Upgrades cannot meet the requirements of a Proposed Project under the agreement. Defendant argues that while a Proposed Project does trigger a process under Section 4.2.2, that specific process has nothing to do with the start-up conditions set forth in Section 7.3.1 and that its October 17, 2019 letter cured any defect under this provision.

Plaintiff contends Defendant's letter, provided 15 months after the SPP awarded the NTC and less than 90 days prior to the December 31, 2019 in-service date of the Nixa Upgrades, does

not cure the defect and was too late.[4]  As a result of this timing, Plaintiff argues the Nixa Upgrades are not a Proposed Project and that Defendant's letter was too late and the opportunity for the Nixa Upgrades to be a Proposed Project, including the relevant requirements under the CDA, had long since passed.

Defendant relies on Plaintiff's COO, J. Grotzinger's, deposition testimony to support its argument that the Nixa Upgrades are a Proposed Project.  Grotzinger, an engineer with more than thirty years of experience, testified during his deposition that the Nixa Upgrades was a proposed project.  Plaintiff argues Grotzinger's testimony constitutes questions of law for the Court and that objections were made during the deposition regarding the testimony calling for legal conclusions rendering any such statements inadmissible at summary judgment.  Further, Plaintiff argues regardless of Grotzinger's testimony the notice of the Nixa Upgrades still came "too late" and Grotzinger confirmed the late notice in his deposition testimony.

Defendant's position is that the CDA does not require a deadline for notice to be given, only for performance to be completed.  Defendant argues there is no deadline for a Proposed Project Notice, in essence arguing that in response to the termination notice a proposed project notice cured the defect.  Defendant further argues, regardless of the interpretation, Plaintiff had actual notice of the Proposed Project because it knew about the Nixa Upgrades and did not attempt to terminate the CDA for at least a year after it gained that knowledge.  Defendant argues the purported termination is barred by the doctrine of laches because Plaintiff waived its right to terminate under Section 7.3.1(d) when it waited more than two years after it alleges the CDA was not working and more than 20 months after it believed there was a default pursuant to Section 7.3.1 before it attempted to terminate the CDA.  Defendant contends Plaintiff knew of its rights

---

[4] Defendant states it was awarded an NTC for the Nixa Upgrades on August 17, 2018 and commenced construction of the project no later than August 2019.

and affirmatively chose not to exercise them which also constitutes an implied waiver of its right to do so. Defendant argues it has made great efforts and incurred costs and liabilities under the CDA and Plaintiff should not be able to obtain the additional value from Defendant's efforts at this late juncture. Further, Defendant argues Plaintiff was not prejudiced by any alleged delay in the "formal" notice when Plaintiff not only knew about the Nixa Upgrades but was ultimately offered participation rights by Defendant. Defendant agues its is "plainly unfair" to allow Plaintiff to terminate when it was not prejudiced by any delay in the issuance of the Proposed Project Notice. Finally, Defendant argues that Plaintiff's failure to provide its attempted notice of termination sooner constitutes a waiver of the notice requirement as it knew of the Nixa Upgrades but failed to act.

After a review of the record before the Court, the Court finds Plaintiff's termination notice dated October 10, 2019, effective as of November 10, 2019, under Section 7.3.1(d) is effective. Defendant failed to satisfy the requirements of Section 7.3.1(d) and Defendant's alleged attempt to "cure" its failure to satisfy the requirements is without merit. As set forth herein, a Proposed Project is a defined term that includes written notice of intent of a Proposed Project as part of the process. Here, Defendant did not give Plaintiff written notice of its intent to propose the Nixa Upgrades or to submit a bid on the project until after it received notice of termination. The Court finds this was in violation of its obligations under the CDA.

## B. Direct Assignment Facility

In addition, Plaintiff argues the Nixa Upgrades are not a Direct Assignment Facility under the CDA because Defendant was obligated to give Plaintiff an unconditional option to Participate in the Nixa Upgrades. A Direct Assignment Facility is one in which Plaintiff is entitled to an unconditional Participation Percentage of "up to fifty percent (50%) and that Defendant's

purported offer to allow Plaintiff to allegedly participate in the Nixa Upgrades came fifteen months after SPP issued the NTC. Plaintiff argues Defendant never even considered Plaintiff's participation in the Nixa Upgrades until after Plaintiff sent its termination notice and initiated this lawsuit. Plaintiff further contends the project was already approaching its estimated completion date at the time the option to participate was given and as a result Defendant never intended to include Plaintiff in the project. Again, Defendant points to Grotzinger's deposition testimony where he testified that the Nixa Upgrades are a Direct Assignment Facility.

Defendant's October 17, 2019, letter states, in part: "[t]his letter provides MJMEUC the option to Participate in a Direct Assignment Facility" and that "[t]his letter is provided, and the availability of any right you may exercise pursuant to our notice exists, only if your purported termination is not effective." In the same letter, Defendant also stated "the notice and exercise periods in the CDA for Option Notices do not fit neatly into this fact pattern. We need your decision on whether to exercise the Participation Option as soon as possible, ideally by November 1, 2019." Plaintiff argues this letter is an "after the fact attempt" to characterize the Nixa Upgrades as a Direct Assignment Facility but that it was too late and the letter fails to give Plaintiff an unconditional option to participate in the Nixa Upgrades so it cannot be a Direct Assignment Facility.

Section 4.3.1 of the CDA states:

**4.3.1 Direct Assignment Projects**. The affected UP or UPs shall have the option to Participate in any TransCo Project or TransCo Project Segment comprising Direct Assignment Facilities as follows:

(d) If involving only one affected UP, the affected UP's option shall be for a Participation Percentage of up to fifty percent (50%) of such Direct Assignment Facilities.

(e) If involving two or more affected UPs (e.g., because a TransCo Project Segment

is located in a zone covered by two or more UPs' Footrpints [sic]), each affected UP shall have an option to Participate in up to fifty percent (50%) of such Direct Assignment Facilities, such option allocated by each UP's pro rata share of total UP LRS in the zone.

Defendant argues the rights and obligations set forth in this section are distinct and separate from the start up conditions in Section 7.3.1.[5] Defendant argues it was not required to give notice and that even if Defendant failed to satisfy the terms of 4.3.1 the remedy set forth in 7.3.1 does not apply.

The Court further finds Defendant's offer to allow Plaintiff to participate in the Direct Assignment facility, *after* Plaintiff issued its notice of termination, and conditioned on Plaintiff's agreement that the "purported termination is not effective," does not satisfy the requirement to offer Plaintiff an unconditional participation right under 7.3.1(d).

For the reasons stated herein, the Court finds Plaintiff's termination under the CDA under Section 7.3.1(d) is effective as of November 10, 2019 and summary judgment is entered in favor of Plaintiff on the issue of termination under this provision.

## 2. Waiver or Stipulation Pursuant to 7.3.1 (c).

Defendant moves for summary judgment arguing Plaintiff cannot terminate the CDA under Section 7.3.1(c) because it waived the requirement that the parties had to agree to the form of the JOA and TCL. Plaintiff did not move for summary judgment under this provision.

Section 7.3.1 (c) of the CDA states:

> If the Parties and any other UPs with fully effective CDAs have not agreed to the form of JOA and TCL or the Parties have not agreed to the form of APA on

---

[5] Section 7.3.1 For Failure to Meet Start-Up Requirements. Either Party may terminate this Agreement by giving the other Party written notice of the intent to terminate effective thirty (30) days from the delivery of such notice, after the periods set forth below; provided, however, that if the requirement is met during such thirty (30) day period, then the termination shall not be effective ... (d) If TransCo has neither been awarded an NTC for a Proposed Project nor commenced Construction of a Direct Assignment Facility on or before December 31, 2017.

15

or before the first to occur of execution and delivery by a UP of the first APA with TransCo and December 31, 2014.

Defendant argues Plaintiff waived this requirement and/or stipulated to compliance with this provision. In support of this argument Defendant states on June 14, 2016, Plaintiff executed a Deadline Waiver which Defendant contends waived Plaintiff's right to terminate the CDA under Section 7.3.1(c). The Deadline Waiver states, in part:

either Party may terminate the CDA i) if TransCo's Financial Closing has not occurred on or before September 30, 2014 (Financial Close Deadline Date) and (ii) if the Parties and any other UPs with fully effective CDAs have not agreed to the form of JOA and TCL on or before December 31, 2014 (JOA/TCL Deadline date)

The Deadline Waiver is signed by the President and General Manager of Plaintiff and the CEO of South Central MCN LLC. The written waiver (whether valid or not) applies to Section 7.3.1(c) and not Section 7.3.1(d) of the CDA. As discussed herein, Defendant argues Plaintiff's conduct constitutes an implied waiver of Section 7.3.1(d).

Plaintiff argues the Deadline Waiver was not knowingly and intentionally agreed upon and a genuine issue of material fact exists with regard to its validity because it was entered into by misrepresentation or mistake. Plaintiff contends that the parties agreed to extend the deadline to December 31, 2015 (in the summer of 2015) because the deadline had expired without agreement. Gridliance's outside counsel drafted and circulated a form of the Deadline Waiver to Plaintiff's attorneys with a December 31, 2015 deadline. Plaintiff argues the parties had no other negotiations or discussions and no other drafts were circulated. It is Plaintiff's position that on June 9, 2016 several documents were circulated for execution and that it was presented that the documents matched the forms that were previously circulated. Plaintiff states the Deadline Waiver was executed on a separate PDF with signature pages only and that the "new" Deadline Waiver had not been agreed upon.

16

Plaintiff argues the Deadline Waiver (which Defendant has filed with the Court and shows a signature on behalf of Plaintiff) was the product of mistake, lacks mutual assent because it was never negotiated, was not agreed to, and was procured as a result of a misrepresentation by Defendant. Plaintiff submits emails, correspondence, and drafts in support of its argument that changes were made to the Deadline Waiver that were not agreed upon and were then signed by mistake.

Defendant states the Deadline Waiver was signed on behalf of Plaintiff (by an attorney and reviewed by additional attorneys) and parole evidence should not be allowed to claim the parties agreed to something else. Defendant further argues Plaintiff would need to demonstrate by clear and convincing evidence that there was some sort of fraud, deception, or bad faith and that Plaintiff has not demonstrated any such evidence. Defendant argues there is no evidence of a final draft in August 2015 and that the agreement was not signed until 2016. Finally, Defendant argues that Plaintiff's allegation that they failed to read the entire Deadline Waiver before executing it does not render the agreement null or void.

Plaintiff argues if the Court grants partial summary judgment determining that the CDA will terminate at the latest on June 30, 2024 or, alternatively, June 14, 2026, then a trial will be necessary to determine whether Defendant failed to meet the start-up requirements and as a result whether Plaintiff was entitled to and did terminate the CDA earlier, effective as of October or November 2019. Plaintiff argues this issue should be not ruled on at the summary judgment stage.

Section 11.9 of the CDA states:

Modifications. Unless otherwise specifically provided herein, this Agreement may be altered, modified, varied or waived, in whole or in part, only by modification executed by the duly authorized representative of both Parties.

Section 11.10 states:

No Waivers.  Any waiver at any time by a Party of its rights with respect to a default under this Agreement or with respect to any other matter arising in connection with this Agreement shall not be deemed a waiver with respect to any subsequent default or subsequent matter of a similar nature arising in connection therewith.

Here, the Court has granted Plaintiff's Motion for Summary Judgment pursuant to Section 7.3.1(d) finding the notice to terminate valid under that provision effective immediately.  As a result, while the issue of termination of the CDA is rendered moot by the Court's ruling, the Court finds Defendant's motion for summary judgment regarding the waiver under 7.3.1(c) is well taken.  The deadline waiver was executed on behalf of Plaintiff.  Plaintiff's argument that it should be rendered void because of deception or misrepresentation is without merit.  The Court finds no evidence of fraud, deception, or bad faith that would survive summary judgment on this issue.  Plaintiff's decision not to review the final version (whether it included changes or not) does not render the agreement void.

"The law permits reformation of instruments to reflect the true intention of the parties when the error has arisen by the unilateral mistake of one party and that mistake is accompanied by clear and convincing evidence of some sort of fraud, deception or other bad faith activities by the other party that prevented or hindered the mistaken party in the timely discovery of the mistake."  *Alea London Ltd. v. Bono-Soltysiak Enterprises*, 186 S.W.3d 403, 416 (Mo. Ct. App. 2006).  Here, the evidence establishes that Plaintiff could have reviewed the agreement before signing it but chose not to.  Plaintiff argues there were multiple documents and signature pages and that they believed the agreement contained different terms.  However, there is no evidence of fraud or bad faith on behalf of Defendant when Plaintiff received the document and could have reviewed its terms if it had chose to do so before signing.  While Plaintiff argues there were numerous documents and signature pages being circulated, the Deadline Waiver is only a single page agreement.  *Id.* ("It is well settled that "[e]quity will not relieve against mistake when the complaining party had within

his reach the true state of facts, and, without being induced by the other party, neglected to avail himself of his opportunities of information."). Therefore, while termination under Section 7.3.1(c) is moot for the reasons set forth herein, the Court finds Defendant's motion for summary judgment on this issue well taken.

### 3. Plaintiff also terminated the CDA pursuant to 7.3.2 by way of the October 11, 2019 letter (supplemented on October 29, 2019) terminating the CDA at the latest on June 30, 2024.

Plaintiff argues alternatively, [6] that Plaintiff had the right to terminate the CDA in compliance with Section 7.3.2 and that MJMEUC issued a timely and valid notice to terminate the CDA in accordance with Section 7.3.2 by way of MJMEUC's written notice dated October 11, 2019, pursuant to which the CDA will terminate at the latest on June 30, 2024 or, alternatively, June 14, 2026.[7]

Section 7.3.2 of the CDA provides:

**7.3.2 At MJMEUC's Option**. MJMEUC may terminate this Agreement during the Initial Term or any Renewal Term with two-years' written notice, such termination to be effective on any day after the tenth anniversary of the Effective Date.

Defendant argues this claim is not ripe for adjudication because it rests upon a future event that may not occur and that Plaintiff does not need a declaration of its rights under this section to carry on its business. Defendant argues any right Plaintiff has to terminate the CDA is contingent on the CDA remaining in effect and all possible intervening events that could affect Plaintiff's rights make a ruling now premature.

The Effective Date for Articles 2, 5, 7, and 8 of the CDA, as defined in Section 7.1.1, is the Execution Date. The Execution Date is a defined term in the CDA. Section 1.27 provides the

---

[6] Plaintiff states "assuming *arguendo*" that the start up requirements of Section 7.3.1(d) were satisfied, Plaintiff issued a timely and valid notice to terminated under Section 7.3.2.
[7] As set forth herein, the Court finds Plaintiff terminated the CDA under 7.3.1(d) effective immediately.

definition as "**Execution Date.** Execution Date is defined in the introductory paragraph of this Agreement." The introductory paragraph of the CDA provides: "This Co-Development Agreement (this Agreement) is entered into as of the 30th day of June, 2014 (the Execution Date)." Accordingly, Plaintiff states the Effective Date for Section 7.3.2 is the Execution Date, which was June 30, 2014 and therefore the termination is effective at the latest on June 30, 2024. Defendant argues that the Effective Date of the CDA is generally the date the parties acknowledged competition of various conditions under Articles 2, 5, 7, and 8 and is June 14, 2016 resulting in a June 14, 2026 date.

Plaintiff exercised its option under Section 7.3.2 through written notices to Defendant dated October 11, 2019 and October 29, 2019. Defendant does not dispute the termination right under Section 7.3.2 and acknowledges that Plaintiff's rights under this Section vest ten years after the Effective Date. Defendant states the right to terminate under 7.3.2 is effective ten years after the Effective Date of June 14, 2016 and therefore vests no earlier than June 14, 2026. Defendant's opposition to Plaintiff's motion for summary judgment on this claim argues the Court should dismiss this claim and not rule because the issue is not ripe and should be dismissed without prejudice. Defendant further argues the right to which Plaintiff seeks a judicial declaration is contingent on future events that are unknown.

Section 7.1.1 of the CDA provides two alternative definitions of Effective Date, depending on the Article of the CDA in which the term appears. Specifically, Section 7.1.1 defines the Effective Date as the Execution Date for certain articles including "Article 7 (Term and Conditions Precedent)," which is the article containing Section 7.3.2. As a result, Plaintiff argues the Effective Date for Section 7.3.2 would be the Execution Date, which was June 30, 2014.

The Court find the effective date for termination under Section 7.3.2 is June 30, 3024. Therefore, in addition to the Court's ruling that Plaintiff effectively terminated the CDA under Section 7.3.1(d), effective immediately, the Court also finds in the alternative that Plaintiff also issued a timely and valid notice to terminate the CDA effective June 30, 2024.

4. **Upon termination of the CDA Plaintiff is entitled to repurchase the Nixa Assets and Defendant is obligated to sell them in accordance with the CDA and the APA.**

Finally, Plaintiff argues the Court should declare that on whatever date termination of the CDA is effective Plaintiff is entitled under Section 7.3.4(c) of the CDA and Section 8.3 of the APA to repurchase the Nixa Assets and Defendant is obligated to sell them in accordance with the CDA and the APA. Here, the Court finds in favor of Plaintiff and finds Plaintiff is entitled to repurchase the Nixa Upgrades under Section 7.3.4(c) of the CDA and Section 8.3 of the APA.

## CONCLUSION

For the reasons set forth herein, the Court **GRANTS** Plaintiff's Motion for Summary Judgment. The Court finds Plaintiff terminated the CDA pursuant to Section 7.3.1(d) effective as of November 10, 2019. Alternatively, the Court finds Plaintiff had the right to terminate the CDA under Section 7.3.2 and that its termination under that provision would be effective June 30, 2024. The Court enters judgment in favor of Plaintiff and **ORDERS** that Plaintiff is entitled under Section 7.3.4(c) of the CDA and Section 8.3 of the APA to repurchase the Nixa Assets and Defendant is obligated to sell them in accordance with the CDA and APA effective immediately. The Court **DENIES** Defendant's motion for summary judgment as set forth herein.

**IT IS SO ORDERED.**

**DATED:** June 3, 2021

/s/     *Douglas Harpool*
JUDGE DOUGLAS HARPOOL
UNITED STATES DISTRICT COURT